Good morning, Council. It's my distinct pleasure and privilege to welcome you back to our courthouse. It has been almost a full year since we have had any in-person proceedings in this courthouse, and we are in a process now where sometimes, where feasible, we are trying to accommodate Council who prefer live argument, if we can do so safely and appropriately, and that's what we're trying to do today. As you see, we have plexiglass. We're far more distanced. We have individual check-in times for your oral argument. You have microphone covers. We have socially distanced galleries and Council tables and all of that sort of things and masks, and we want to make this a safe experience for all, but we recognize that the solemnity and the experience of being able to have the lawyers present their cases in person is an advantage to be able to see that, and so we appreciate your cooperation and all the safety precautions so that we could do this today, and we welcome you to the Fifth Circuit. The case for this morning, the first case, is 2020-50687, Amy Harrison v. Kevin Lilly et al. Mr. Melton, you may present your argument, sir. It's good to be back. May it please the Court, the appellant and my client, Amy Harrison, was employed by the Texas Alcohol and Beverage Commission, or TABC for short, from 1990 until her termination on July 12, 2017. At the time she was terminated, she held the position of licensing director. In May of 2017, one of the appellees, Kevin Lilly, was appointed by Governor Greg Abbott to serve as commissioner and chairman of the TABC. In June of 2017, Mr. Lilly contacted Ms. Harrison regarding his personal stock holdings and asked her how reasonable she should be interpreted under the conflict of interest provision of the Texas Government Code. Ms. Harrison informed Mr. Lilly that that was beyond the scope of her role as a licensing director and that she should consult, or he should consult, with an attorney. That same day, Chairman Lilly sent a list of his personal stock holdings to the TABC General Counsel, Emily Helm. When she saw it, and copied Ms. Harrison, when she saw it, Ms. Harrison discovered that there was overlap between his stock holdings and the entities licensed by the TABC and thought that this could potentially constitute a violation of the Texas Alcohol and Beverage Code, the Texas Government Code, and the Texas Penal Code. Ms. Harrison had not been asked to perform an analysis of this information and that was not part of her job duties to do so as she's not an attorney. Could I ask you a question? Yes, of course, Your Honor. Is the access to the stock portfolio, would a member of the public have had access to that or did she gain that access because of her job duties? Well, I would say she didn't gain it because of her job duties, but because she isn't an attorney. But as far as I know, the stocks themselves would be public, but the actual portfolio put together in one particular document may not be public record. But the information that Ms. Harrison would have that she would have superior knowledge of is who was licensed with the TABC because she is the licensing director. Is the list of licensees available to the public in any way? I don't believe the list would be. I mean, the actual fact that a company is licensed with the TABC would be public. I'm not sure if there's a list out there that would be compiled that the public . . . But you don't believe that because she gained this information in her capacity as counsel and it was assembled in a way that she could readily analyze it, you don't believe that that's dispositive of this case. Can you explain why? That's correct. Because if all she had done was compiled the list of licensed companies and provided it to Ms. Helm or Chairman Lilly, then that would have been pursuant to her official job duties. What she did was beyond that. She said in her non-legal opinion that she believed that these could potentially be conflict of interest and violation of the law. Did she say that to anybody outside of TABC? Not outside of TBC, Your Honor. One of my arguments, though, is that . . . So it was a purely internal communication? But outside the chain of command to Ms. Helm. Ms. Helm is not within her chain of command. And she also informed the HR director as well, who is also not in her chain of command. So, yes, they were internally within the TABC. You're correct about that. But I think some of the cases make a distinction between internal communications and those made in the chain of command. Her chain of command was Chairman Lilly and Mr. Swetberg, but she also informed people outside the chain of command. Counsel, what is your best case, post-Garcetti case, that would support a ruling in your favor? Sure, Your Honor. There's two. There's the Davis v. McKinney case. And in that case, the Fifth Circuit in 2008 held that internal complaints of excessive pay made within the chain of command, of excessive pay of VPs, was made as a citizen. And that's under Head Note 2 of that case. When you combine that with the Charles v. Grief case, which also stated that an employee's speech is not protected merely because it concerns . . . is not not protected because it merely concerns facts that happen to be learned while in the workplace, which goes back to her knowledge of the list of Chairman Lilly's stockholdings. Just because she found that out while she was at work, doesn't mean that it's not protected. So the most on-point case, I believe, is the Davis case. But when you combine it with the Charles v. Grief case as well, that's where we get over the hurdle of the First Amendment. The case most relied upon by the defense is the Williams v. Dallas Independent School District case. In that case, an athletic director sent a memo to a school principal about the misuse of athletic funds. The court held that this was done pursuant to his official duties because of an activity undertaken in the course of performing his job and that the memo concerned matters under the athletic director's purview, namely a use of funds for school athletic teams. The primary difference between that case and this case is that Williams was doing something to affect his job, telling the principal about misuse of funds that directly affected his budget. What Ms. Harrison was reporting was never something that was going to affect her job. She was given a non-legal opinion on whether certain stockholdings would potentially violate the law and has nothing to do with her job as a licensing director. But wasn't that part of her job to digest this information and produce a result and report it? It was part of her job to give him the information of who was licensed with the TABC. And if that's all she had done, then we wouldn't have a case. Just like Ms. Helm, who was also terminated, doesn't have a case because she was giving a legal opinion that was part of her job duties. So when you compare what Ms. Harrison was supposed to do with Ms. Helm, I think it's, you know— So is it fair to say that you're arguing that she came into the information as part of her job but what she did with it was above and beyond her job responsibilities and so therefore that would fall within the ambit of Davis and Charles? That's correct, Your Honor. That is what I'm saying. If she had just given him the information on the licensing and got fired for that, then that was part of her job duties and the Williams case would apply. But she didn't just do that. She communicated both with Chairman Lilly, with General Counsel Helm, HR Director, and her boss, all of this information because she felt that there was a potential conflict of interest here. And he had just become the chairman and so she felt a civic duty to bring this to light and then ultimately was terminated for it. Could you remind us, did anything change as a result of her providing this information? Not that I'm aware of. That's not in the record that he actually did say, oh, I'm going to recuse or I'm going to divest or none of that? None of that's in the record and I don't know what happened. I believe he might still be the chairman today, last time I looked. But as far as anything that happened after that, I'm unaware, Your Honor. And that's what the, basically that's the issue and that's what the district court granted the motion to dismiss on. There is an issue, I guess, with the qualified immunity and the district court, of course, and the lower court declined to rule on the issue of qualified immunity. And according to the Zapata versus Melson case, that's basically a tantamount to a denial of the defense. The defendants have not appealed that order. So based on that reasoning, I don't think it's before the court. But the Randall versus Lockwood case that we've cited states, the Fifth Circuit case from pretty recently, that it's the district court who is best equipped to deal with the issue of qualified immunity. The other side, the appellees have cited a couple of cases that I'd like to address. Strata versus Roe, they cite for the general proposition that this court can affirm the district court judgment on any basis supported by the record. This case is clearly distinguishable because the district court in that case had granted the motion to dismiss based on qualified immunity. That, of course, has not occurred here. They also cite the Porter versus Epps case for the general proposition that qualified immunity should be resolved at the earliest possible stage in the litigation. While I agree with that, in Epps, the court actually submitted the issue of qualified immunity to the jury to determine whether or not the defendants were entitled to it. So I don't think that case really has any bearing on the case before Your Honors. Mr. Melton, assuming arguendo, and I'm certainly not foreshadowing, that you were correct on the Charles D. Grief point, the district court could still pursue the qualified immunity and study that in detail, couldn't it? It could, Your Honor. If I heard Your Honor correctly. What now? The district court could address that issue if the case was sent back. Is that your question? Yes. If there was, you know, you need to consider this qualified immunity and make a ruling on it. Right. If there's not been a ruling on it, because that's supposed to be addressed early on. So do that, please. Right. Well, if the case is reversed, I'm sure the other side will raise the issue of qualified immunity again. And we'll argue that. But I believe the Davis case shows that it has been clearly established that an internal complaint can be protected if it's made as a private citizen. So if it goes back to the district court on qualified immunity, that is what we'll be arguing. But I believe it's supposed to be decided by the lower court. Quick housekeeping question. Yes. There's nothing in your briefing about amending the complaint or any of that. So you're not pressing that point with us. The leave to amend? No, Your Honor. I'm not pressing that. Could you distinguish the Williams v. Dallas Independent School District case? Yes, Your Honor. The primary difference is that Williams was doing something that affected his job. He was reporting issues to his superiors that would affect his budget, misuse of funds. This is stuff that affects him. What Ms. Harrison was doing doesn't affect her job. She was just merely reporting what she believed to be potential violations, and that has no effect one way or another on her job, assuming she didn't get terminated. So that's the main difference. The Williams case was kind of taking the Garcetti case a little bit a step further, whereas the Garcetti case said, you know, it has to be your job duties. And in Williams, the court found that what he did, the memo he wrote, was not part of his job duties, but found that it was part of his job that he was supposed to be doing, and he had to communicate with his supervisor in order to deal with budgetary issues. So the court held that the First Amendment didn't apply. My argument that this is different is that Ms. Harrison didn't need to do what she did. Does that answer your question, Your Honor? Yes, it does. So unless the court has any other questions, I'll reserve the rest of my time. Thank you. You have saved time for rebuttal. Thank you. Mr. Carter. Thank you, Judge Elrod, and may it please the court. This case comes down to whether Amy Harrison spoke as the licensing director when she sent internal emails to higher-ups within the commission about which entities held licenses with the commission. She spoke as an employee for at least three reasons. First, her speech was closely related to her job duties as the licensing director. Second, her speech reflected a special knowledge gleaned from serving as the licensing director. And third, her speech was solely internal and went up the chain of command. But it was not up the chain of command. Excuse me, Your Honor? So I thought the argument is that it was outside the chain of command, and it was beyond what her job duties would have required her to do. And it was kind of a noisy complaint within the office, basically. So regarding the chain of command, her speech was to Chairman Lilly and to the acting executive director and the general counsel. But she was supposed to just talk to Chairman Lilly, right? That's her job is to advise Chairman Lilly, correct? So if you look to the context of the pleadings, the email that Chairman Lilly sent to Harrison he also sent to the general counsel. So her response was to the general counsel and ultimately to Chairman Lilly. What about HR? I'm not sure if that's in the pleadings, whether they spoke to HR. But setting that— We just heard an argument about it, so can you address HR, please? Yes, I don't believe that's in the complaint, but to the extent that it was, her response in the context of Kevin Lilly sending the message to Harrison about that was within her capacity as an employee because— I'm sorry. I'm having trouble hearing you. I think it's because you're far from the microphone. I'll lean down. Capacity as an employee, is that what you said? Yes, Your Honor, that's the question. As the court said in Williams, a speech that is not necessarily required by job duties but is nevertheless pursuant to their job duties, if it's an activity undertaken in the course of performing their job, and so the inquiry is whether they spoke in their capacity as an employee. Here, Chairman Lilly sent a message to Harrison about potential conflicts of interest, and then he sent a list of his private stock holdings. So she should have sent a letter to the newspaper? If she had gone outside of the commission, that would make this a closer case. And it makes it a harder thing because she's a lawyer receiving information. I'm not sure if she's a lawyer. She's not a lawyer? As the licensing director, I'm not sure. I'm not entirely sure about that. I don't know if it's in the plea. We had a conversation about that earlier. Okay. Well, still, in response to the inquiry sent from Chairman Lilly, her response was to the general counsel, and then you see the general counsel went and spoke to Chairman Lilly about it. Are you aware of anything in the record that tells us whether or not changes were made or whether or not this device was heated? No, Your Honor, there's nothing in the pleadings, and that wouldn't really be relevant to this question either way because this question is specifically about what capacity Harrison was speaking in when she spoke. And so the other side relied on Williams and Davis. So in Williams, for instance, the— It might be relevant to the people of Texas, though, who are reading this case. Sure. So that's why I wanted to know if it was in the record. No, Your Honor. With respect to what capacity Harrison was speaking in, that wouldn't bear on this issue. It would on other issues such as whether it's a matter of public concern. Now, going back to Williams— Was Harrison not being punished for speech that concerns something that she happened to learn at work that was—Charles v. Grief outlines this, that the punishment of people for something they learn at work is not to occur. So the speech in Charles v. Grief, first of all, it was from a systems analyst to a state representative about potential race discrimination and retaliation within the commission. That had nothing to do with— It was far removed from the realm of his capacity as a systems analyst within the lottery commission. Now, contrast that with here. You have speech that's about which entities held licenses with the TABC, and it's solely internal to his boss, to the general counsel, and to Chairman Lilly. And this goes to another point that the other side was talking about with regard to if this speech was just about who held licenses, it would not be protected, but that Harrison went a step further. You see, in cases like Davis and Williams, the speech wasn't solely about, in Williams, for instance, the budget. What he also said was, well, it appears the principal's office is running a shop for his friend's favoritism, running by house rules. That was an additional complaint beyond the budget, but the court still said that that was the speech of an employee. Well, what about, why isn't there something of that here where they say, not only does he have some potential conflicts, but these might be criminal matters? Why isn't that analogous? So that's the same as in Williams, because the court said in Williams that that was the speech. So you're saying that's the analogous point. Is that in Williams, he went beyond and alleged that the principal was running. But I thought if it's beyond, that's a good thing for the survivability of the claim. No, maybe I can help explain that a little better. Maybe so. My point is that the speech in Williams went beyond just talking about the budget. But the court still said that he spoke as an employee. Now, if you look at the speech in Davis, for instance, the speech was about specifically with regard to the response to the internal audit. And there the court said it was directly related to her job as an internal auditor. But her job duties weren't about the response to her audit. Her job was to look at the computers within the university and determine whether there was any problem. So even though her job duties had nothing to do with the response, her speech went beyond that, which was about how the higher-ups had responded to it. The court nevertheless said that that speech was employee speech. Now contrast that with the speech about the pay of the higher-ups and how they were creating a community of people who were overpaid and not doing much. There the court said that had nothing to do with her job as an internal auditor who audited computers. That was about a more general complaint. Why wouldn't that be an internal auditor's point? Because an internal auditor is supposed to look for areas of potential liability. And that's to say that people are being paid more than the market rate would be a problem. To me, that seems like that would be part of the internal audit, especially that there's an issue that people are not doing their work. That to me seems internal auditee. So let me be more specific. The court in Davis was faced with an internal auditor that was solely auditing the computer-related. Okay, so it wasn't a general internal auditor giving a report to the board or something. Excuse me, say that one more time. It wasn't a general internal auditor giving a report to the board or something. Right, it was specific to computer-related audits. Do you want to—we can freeze the time. I would be happy to do that, yeah. Okay, we'll freeze the time and you can get some towels. Something had to happen. These things happen to many, many lawyers through the years. Sometimes people have spilled things, but we'll get them picked up. My apologies. So to the Davis point, the internal auditor there was specific to computer-related activities. The time needs to be going again. And thus, that's why it's distinguishable. And something else that we touched on before was the special knowledge point. That principle goes towards when the employee is speaking at a greater authority than a private citizen would be able to. And here we have that. As my friend on the other side said, if this was just about being the licensing director, that would be one thing. But here, she spoke on a greater authority because she knew about, A, his private stock holdings, and, B, which entities were licensed with the commission. And thus, her speech reflected her greater authority speaking as the licensing director rather than the private citizen speaking in the outside context. Now, you are not attempting to argue here that she was really let go for a different reason altogether and that that is dispositive. No, Your Honor. And specifically with this inquiry, it's not about the motivation for her termination. Specifically on this second factor, we're talking about what capacity she was speaking in. And thus, regardless of whether her speech was a matter of public concern or whether it was a motivating factor behind her termination. So, and certainly not foreshadowing. So, if we were to find that it was not close enough to government speech, then we would have to send this back? I don't think the court needs to do that because every indication shows that this speech was made as an employee and not as a private citizen. Going through the cases and what we talk about in our briefs, it's fairly clear that every indication says that she spoke as an employee, and that's dispositive here. But that's the one and only issue, right? And if we disagree, should we send the case back? Yes, Your Honor. The only issue here, the only issue the district court decided this motion to dismiss on is that point. Well, I've covered everything I need to cover, and I'm happy to continue answering questions if you have any. Did you want to argue at all about the qualified immunity? Sure, Your Honor. The qualified immunity issue, the district court passed on it. The only reason we raised it here was because this seems like a clear case for qualified immunity. And the court has said that it should be resolved as early as possible. Specifically here, the court has never held that speech that is solely internal, that's related to their job duties, would somehow receive First Amendment protection. And thus, because it's a clear case, the court could resolve it on that ground. However, the court does not need to reach qualified immunity at all because every indication says that her speech was spoken in her capacity as the licensing director. Based on her greater authority as the licensing director. And thus, her speech is not protected by the First Amendment. Is it the state's view that in order to be protected, Ms. Harrison should have gone to DPS, should have gone to the DA's office in Travis County, or some other outside authority in order to be protected? So, I think that that would make this a closer case. If she had gone to a law enforcement authority, she may have a remedy under state law. However, this case isn't bad because it was solely internal. But yes, if she had done things differently, then perhaps this speech may have been protected. It seems that the rule that the state is seeking is basically, you're not doing yourself any favors if you raise grievances internally. You're best served by going to the police, by going to law enforcement, instead of raising employee grievances within the agency. I think that this would be a closer case if she had gone externally. But again, as this court said in Williams, this is a very practical inquiry, and so I wouldn't say it's a hard and fast rule. But specifically in this case, for instance, her speech to the General Counsel was also made to the acting director. And it was also made in direct response to an inquiry from Chairman Lilly. I think there's at least two lines to be drawn before we reach that point, and I don't think that's a rule that the court would have to lay down in order to rule in our favor. Well, if there are no further questions, thank you. Thank you, Mr. Carter. We have your argument, sir. Mr. Melton, you've saved time. Your Honor, I'll be brief. I guess the fact that she didn't go externally outside the internal TABC just shows that no good deed goes unpunished. To clear up, 4.10 of the complaint, which is in Record Excerpt No. 2, discusses the report, the discussion she had with HR. And then the complaint in paragraph 4.3 states that in her non-legal opinion, I mean, she's not a lawyer, and I think the complaint makes that relatively clear. As far as what the Garcetti case, the U.S. Supreme Court said was that they were talking about the duties of the prosecutor to report what he reported. But the Garcetti case made clear, and the Fifth Circuit has also stated, is that internal speech can be protected because many citizens do their talking within the workplace. And it just seems to me that this is the kind of speech made internally, but also outside of the chain of command, is exactly the kind of speech that the First Amendment is designed to protect. Furthermore, Garcetti also stated that the First Amendment can protect speech related to the speaker's job and cited Pickering, the original case, Supreme Court, on this, which stated that teachers are most likely to have knowledge regarding the operation of a school. And that was what Charles v. Greif, the Fifth Circuit, basically supported. The controlling factor in Garcetti was that the employee was doing something that he was required to do. And that is not in this case. Ms. Harrison was not required to do what she did. She was required to help Chairman Lilly by telling him who's licensed. But she took it further by saying in her non-legal opinion that she believed this could potentially be a violation of the law, which, in fact, Ms. Helm said the same thing, was forced to resign, and doesn't have a case because that was what her job was to do. Ms. Helm was the lawyer, given the opinion, not Ms. Harrison. So we believe that the court should reverse the lower court's decision and send this case back to trial. Thank you. Thank you, Mr. Melton. We have your argument. Thank you. We appreciate both counsel arguing today, and this case is lidded. The court will stand in recess until its next argument at 11 a.m. Thank you very much.